UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No.  2:08-cr-00093-KJM-2 |
| Plaintiff, | |
| v. | ORDER |
| JEREMY MICHAEL HEAD, | |
| Defendant. | |

Defendant, through counsel, moves for an order granting a reduction of his sentence to time served under 18 U.S.C. § 3582(c).  Defendant makes this motion in light of the increased risks to health that the coronavirus ("COVID-19") poses to incarcerated persons and to him in particular.  For the following reasons, the court GRANTS defendant's motion.

I.      BACKGROUND

On May 30, 2013, a jury found defendant Jeremy Head guilty of conspiracy to commit mail fraud, in violation of 18 U.S.C. § 1349, and two substantive counts of mail fraud, in violation of 18 U.S.C. § 1341.  Opp'n, ECF No. 1711, at 4; *see also* Verdict, ECF No. 774.  On October 29, 2014, the court sentenced defendant to 120 months on each of counts one, three and eleven to be served concurrently for a total term of 120 months imprisonment and 36 months supervised release, and also ordered payment of the $300 mandatory special assessment.  Mins. of Sentencing, ECF No. 1025.  Defendant and the government later stipulated that he owed more

than $8 million in restitution to more than 50 victims. Stip., ECF No. 1246; Am. Judgment, ECF No. 1514. Since December 10, 2014, defendant has been serving his sentence, first at FCI Taft and, since his transfer on September 2, 2015, at USP Lompoc, *see* Opp'n at 4 (noting defendant is incarcerated at "Lompoc Prison Camp") (citing Opp'n, Exs. 1–2, ECF Nos. 1711-1–1711-2); Mot. at 8 (noting defendant is incarcerated at USP Lompoc). At USP Lompoc, currently 16 inmates and 5 staff have reportedly tested positive for COVID-19, 158 inmates have "recovered," and 2 inmates have died from COVID-19. *See* Bureau of Prisons (BOP), *COVID-19 Cases* (updated daily), https://www.bop.gov/coronavirus/.

On May 5, 2020, defendant filed a pro se motion to compel the BOP to "expedite order [sic] for compassionate release," in which defendant explained BOP has identified him as eligible for release to home confinement in light of the Attorney General's directive to prioritize home confinement as a way to combat the spread of COVID-19. Mot. to Compel, ECF No. 1696 (citing Mem. from U.S. Att'y Gen. William Barr to Director of Bureau of Prisons (March 26, 2020)). It appears BOP approved defendant for transfer to home confinement on or about April 15, 2020, but now, nearly two months later, he has yet to be released to home confinement. *See* Mot. to Compel at 3, 15 (email correspondence with "Camp Unit"). According to correspondence submitted with defendant's pro se motion to compel, USP Lompoc will not transfer persons to home confinement until they have undergone a period of quarantine within the prison, but there is no space to quarantine defendant, and, as of the date of his motion, defendant had yet to begin quarantining. *Id.* at 15; Mot. at 9. As a result, defendant remains incarcerated at USP Lompoc. Mot. at 9.

After the court appointed counsel for defendant in light of the motion to compel, ECF No. 1699, the court held a telephonic status conference on the matter, ECF No. 1700, following which the parties agreed to stipulate to a briefing schedule for any formal motion for compassionate release that defendant, through counsel, would file, ECF No. 1701. As provided by that stipulation, defendant filed the instant motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A), on May 22, 2020. Mot., ECF No. 1710. In that motion, defendant argues that his history of asthma makes him particularly susceptible to developing serious complications

1   from a COVID-19 infection and, paired with the outbreak at the facility where he is housed,

2   "extraordinary and compelling reasons" warrant compassionate release.  *Id.* at 13; Mot. to

3   Compel at 10 (medical record showing asthma diagnosis).

4          The government opposes defendant's motion, Opp'n, ECF No. 1711, and plaintiff

5   has replied, Reply, ECF No. 1712.  The court submits defendant's motion and resolves it here.

6   II.      LEGAL STANDARD

7          Defendant brings his motion for release under 18 U.S.C. § 3582(c)(1)(A)(i), which

8   allows a court to modify a sentence under certain circumstances, namely after defendant meets

9   certain exhaustion requirements.  *See* 18 U.S.C. § 3582(c)(1)(A).

10          In deciding whether to modify a sentence and grant compassionate release

11   following exhaustion, as relevant here, a district court engages in a two-step process.  First, it

12   must consider the familiar 18 U.S.C. § 3553(a) factors applicable at the original sentencing, to the

13   extent they remain applicable at the time a motion is brought.  18 U.S.C. § 3582(c)(1)(A).  These

14   include, *inter alia*, the need for the sentence "to protect the public from further crimes of the

15   defendant" and "to reflect the seriousness of the offense[.]"  18 U.S.C. § 3553(a).  Second, the

16   court must find that "extraordinary and compelling reasons warrant such a reduction."  18 U.S.C.

17   § 3582(c)(1)(A)(i).  An alternative provision provides for consideration of a motion by a

18   defendant who is 70 years or older, which is not applicable here.  18 U.S.C. § 3582(c)(1)(A)(ii).

19          The statute further requires "that such a reduction is consistent with applicable

20   policy statements issued by the Sentencing Commission."  *Id.* § 3582(c)(1)(A).  In 2006, the

21   Sentencing Commission issued a policy statement addressing what qualifies as "extraordinary and

22   compelling reasons" to release a defendant from BOP custody, which was last amended

23   November 1, 2018.  *See* U.S.S.G. § 1B1.13.  Since passage in December 2018 of the First Step

24   Act (FSA),[1] which amended § 3582 to allow a defendant to file a motion for compassionate

25   release directly with the court, district courts have disagreed whether U.S.S.G. § 1B1.13 remains

26   binding.  A number of district courts nationwide have determined that the policy statement

27

28   [1] Pub. L. No. 115-391, 132 Stat. 5194 (2018).

provision "no longer fits with the statute," *United States v. Cantu*, 423 F. Supp. 3d 345, 351 (S.D. Tex. 2019), because the statement has not been amended since the First Step Act passed to reflect that both defendants and the BOP may move for compassionate release.  *See United States v. Allen*, No. 2:17-CR-0229-TOR-12, 2019 WL 6529113, at *2 (E.D. Wash. Dec. 4, 2019); *United States v. Willingham*, No. CR113-010, 2019 WL 6733028, at *2 (S.D. Ga. Dec. 10, 2019) (noting "[i]n at least four judicial districts, courts have determined that the First Step Act signaled an intent from Congress that district courts may now consider whether extraordinary and compelling reasons for compassionate release exist other than those delineated in U.S.S.G. § 1B1.13 n.1" (citations omitted)).  Many courts in this circuit have nonetheless "turned to U.S.S.G. § 1B1.13 to provide guidance on the 'extraordinary and compelling reasons' that may warrant a reduction in sentence." *United States v. Esparza*, No. 1:07-CR-00294-BLW, 2020 WL 1696084, at *2 n.2 (D. Idaho Apr. 7, 2020) (quoting *United States v. Gonzalez*, No. 2:18-CR-0232-TOR-15, 2020 WL 1536155, at *2 (E.D. Wash. March 31, 2020)), *appeal filed*, No. 20-30083 (April 8, 2020); *see also Riley v. United States*, No. C19-1522 JLR, 2020 WL 1819838, at *8 (W.D. Wash. Apr. 10, 2020) ("In the absence of contrary controlling authority, and given the limited statutory exceptions to the general rule of the finality of judgments, this court will continue to follow the guidance of the Sentencing Commission's policy statement limiting the scope of 'extraordinary and compelling reasons' that warrant compassionate release under § 3582(c)(1)." (citing *Dillon v. United States*, 560 U.S. 817, 827 (2010))), *appeal filed*, No. 20-35334 (April 13, 2020)). However, there is also a strong contingent of cases in which the presiding judge has concluded the guidelines are no longer limiting, and the court has discretion to define what constitutes an "extraordinary and compelling" reason. *See, e.g.*, *United States v. Rodriguez*, No. 17-cr-00021-WHO-1, 2019 WL 6311388, at *7 (N.D. Cal. Nov. 25, 2019) ("This court follows the growing number of district courts that have concluded that, in the absence of applicable policy statements, courts can determine whether any extraordinary and compelling reasons other than those delineated in U.S.S.G. § 1B1.13 cmt. n.1(A)-(C) warrant compassionate release."); *United States v. Chan*, No. 96-cr-00094-JSW-13, 2020 WL 1527895, at *4–5 (N.D. Cal. March 31, 2020) (noting split in authority and following *Rodriguez*); *United States v. Parker*, No. 2:98-CR-00749-

4

CAS-1, 2020 WL 2572525, at *8–9 & n.9 (C.D. Cal. May 21, 2020) (collecting cases finding U.S.S.G. § 1B1.13 is no longer limiting but considering the policy statement as guidance).

In resolving the instant motion, this court, as it has in other similar cases, considers the Sentencing Commission's policy statement as guidance, but need not determine whether it is binding in this context.  The court notes that, in addition to listing possible "extraordinary and compelling reasons," § 1B1.13 "imposes an additional consideration of whether the defendant is a danger to the safety of any other person or to the community."  *United States v. Numann*, No. 3:16-CR-00025-TMB, 2020 WL 1977117, at *2 (D. Alaska Apr. 24, 2020) (citing U.S.S.G. § 1B1.13(2)).

III.    DISCUSSION

A.    Exhaustion

As defendant acknowledges, defendant must meet the exhaustion requirements of § 3582 before the court can consider motion for compassionate release.  As evidenced by the email correspondence attached to defendant's motion, defendant submitted a request for reduction in sentence on April 15, 2020, well more than 30 days ago.  Mot., Ex. C, ECF No. 1710-3, at 1.  The exhibit shows defendant sent an email to the Warden stating: "I AM REQUESTING THAT THE BOP SUBMIT A MOTION ON MY BEHALF FOR IMMEDIATE RELEASE PURSUANT TO 18 USC 3582(C)(1)(A)--(COMPASSIONATE RELEASE)--DUE TO THE COVID-19 VIRUS AND MY PREEXISTING CONDITIONS RENDERING ME VULNERABLE TO THE DISEASE."  *Id.*  A response from " Camp Unit" states: "Unit Team is currently reviewing inmates under the Attorney General's memo.  You will be contacted if you are being considered."  *Id.*  While the government notes that BOP personnel are unable to locate any record of this email, it does not argue the email is falsified in any way.  Opp'n at 6 n.3.  Nor does it argue the Camp Unit's response to the email affects whether the 30-day time period has lapsed for the purpose of exhaustion under § 3582(c)(1).  Rather, the government argues (1) there is no evidence the email was ever received by the Warden and (2) the email lacks the minimum

1    required information required for a motion for compassionate release under 28 C.F.R.

2    § 571.61(a)[2].

3                                  1.        Receipt by the Warden

4              As for the first argument, at least two other district court have found that the "30-

5    day period should be measured from the date on which a prisoner submits his or her request to the

6    BOP, not the date the request is received by the Warden." *United States v. Feucht*, No. 11-CR-

7    60025, 2020 WL 2781600, at *2 (S.D. Fla. May 28, 2020); *see also United States v. Resnick*, No.

8    14 CR 810 (CM), 2020 WL 1651508, at *6 (S.D.N.Y. Apr. 2, 2020) (finding same); *but see*

9    *United States v. Kinley*, No. 1:16-CR-10018-003, 2020 WL 2744115, at *2 (W.D. Ark. Apr. 17,

10   2020) (finding exhaustion not met where defendant offered only her own declaration stating she

11   sent request to warden, in part because defendant "provides no evidence of whether the warden

12   received [her] request and made a decision on it").  This conclusion follows from the "prisoner

13   mailbox rule," which clarifies an appeal is considered "filed" "on the date the pro se prisoner

14   delivers the notice to prison authorities for mailing" rather than the date the filing is received by

15   the recipient.  *Houston v. Lack*, 487 U.S. 266, 276 (1988); *Feucht*, 2020 WL 2781600, at *2.

16   Here, defendant intended his request for the Warden, who is listed in the "To" field, Mot., Ex. C

17   at 1, and that he sent it to, and it was received by, prison officials on April 15, 2020, because

18   "Camp Unit" responded that same day.  *Id.*  Even if the "prisoner mailbox rule" does not apply

19   here, that the Warden was the recipient identified in the email address line and that prison

20   _____

21            [2] 28 C.F.R. § 571.61 outlines procedures for filing a request for a motion for
     compassionate release with BOP and requires:

22            The inmate's request shall at a minimum contain the following
23            information:

24            (1) The extraordinary or compelling circumstances that the inmate
              believes warrant consideration.

25            (2) Proposed release plans, including where the inmate will reside,
              how the inmate will support himself/herself, and, if the basis for the
26            request involves the inmate's health, information on where the inmate
              will receive medical treatment, and how the inmate will pay for such
27            treatment.

28   28 C.F.R. § 571.61(a).

                                                      6

1    officials processed the email is evidence that the email was, or should have been, received by the

2    Warden.  Accordingly, the court considers April 15, 2020 as the date defendant's request was

3    "filed" with BOP for the purpose of exhaustion under § 3582(c)(1).

4                              2.      Adequate Information

5                Second, the government argues defendant's email request lacks two pieces of

6    information required to qualify as a motion for compassionate release: (1) it does not state

7    defendant's health problems or any other "extraordinary and compelling reason" for release; and

8    (2) it lacks a release plan.  Opp'n at 13–14.  Defendant explains that he sent the April 15 email at

9    the same time he had been preliminarily approved for home confinement at a specific address

10   with a specific release plan; the record strongly suggests prison officials were aware of

11   defendant's vulnerability to COVID-19 and acknowledged receipt of his release plan in an email

12   on April 16, 2020, in which Camp Unit staff wrote: "You signed the Supervised Release plan,

13   progress report and conditions of home confinement . . . We are processing your RRC/HC

14   paperwork, it has to route (takes 7-10 days), then it is sent to the RRM's office. They will

15   determine a date. Unfortunately, we can [*sic*] do not know. Once we do, we can advise you. Your

16   family can prepare now."  Mot. to Compel at 15 (email from Camp Unit to defendant).  The

17   record also shows defendant had sent his signed release plan to his case manager as early as April

18   14, 2020.  *Id.* at 13–14.  It includes his address, the source of his insurance, and his employment

19   plans. *Id.*

20               In sum, the record supports the conclusion prison officials were aware of

21   defendant's medical vulnerability (his "extraordinary and compelling reason" for release) and his

22   release plan.  For these reasons, and because pro se filings by prisoners are to be construed

23   liberally, *see Simpson v. Evans*, 525 F. App'x 535, 536 (9th Cir. 2013) ("[P]ro se habeas

24   petitioners are often not well-versed in the complex procedural rules that govern federal habeas

25   petitions. For this reason, [a] document filed pro se is 'to be liberally construed." (internal

26   quotation marks and citation omitted)), the court finds defendant's not having packaged up

27   together all of the required information in support of his initial request to the Warden seeking

28

                                              7

1    compassionate release does not prevent the triggering of the 30-day time period on April 15,

2    2020, the date of defendant's initial email.

3              3.    Conclusion on Exhaustion

4              The court finds defendant's April 15, 2020 email constitutes a request to the

5    Warden for a motion for compassionate release, and thirty days have passed since defendant sent

6    that request.  The government does not argue that BOP's response to defendant's April 15 email

7    affects whether thirty days has "lapse[d]" within the meaning of § 3582(c)(1); rather it appears to

8    take the position the statute only requires that defendant wait thirty days after filing his request

9    with the Warden before filing a motion with the court, regardless of whether he receives a

10   response from BOP.  As this court has noted previously, the text regarding a "lapse" of 30 days in

11   § 3582(c)(1) is not a model of clarity, and the court is not necessarily persuaded by the

12   government's reading of the text.  *See United States v. Johnson*, No. 2:15-CR-00003-KJM, 2020

13   WL 2307306, at *4 (E.D. Cal. May 8, 2020) (citing *United States v. Weidenhamer*, No.

14   CR1601072001 PHX ROS, 2019 WL 6050264, at *2 (D. Ariz. Nov. 8, 2019)).  However, the

15   court need not resolve any question of statutory construction here.  As of the filing of defendant's

16   motion, the Warden had not responded to defendant's April 15 request.  *See* Reply at 9.  The

17   government notified the court on June 8, 2020 that the Warden denied defendant's request for a

18   motion for compassionate release on May 28, 2020, Not., ECF No. 1715, after 30 days had

19   passed from the April 15 request.  Because at least thirty days have passed since the date

20   defendant initiated his request for compassionate release, it is undisputed he has exhausted.

21   Accordingly, the court proceeds to consider the merits of the motion below.

22        B.    "Extraordinary and Compelling Reasons"

23             Defendant argues his history of asthma makes him particularly susceptible to

24   developing serious complications from a COVID-19 infection; this history in light of the current

25   outbreak at the facility where he is housed provides the "extraordinary and compelling reasons"

26   warranting compassionate release.  Mot. at 8.  The government counters that (1) defendant has

27   not shown he currently suffers from asthma, and (2) even if he does have asthma, this condition

28   does not rise to the level of an "extraordinary and compelling reason" within the relevant

1    Sentencing Commission's policy statement.  Opp'n at 14–16.  The court addresses these

2    arguments below.

3                            1.      Evidence of Defendant's Asthma

4             The government points out that defendant's asthma has not been reported

5    consistently on his health records, and defendant himself said he was healthy and did not mention

6    asthma when interviewed for his presentence investigation report in 2013.  Opp'n at 5 (citing

7    Opp'n, Ex. 4–8 (medical records); PSR ¶ 45, ECF No. 1029).  The government emphasizes a

8    March 2017 Chronic Care Clinic Encounter record in which the provider noted defendant denied

9    having a history of asthma and did not have symptoms at the time FCI Taft diagnosed him with

10   asthma, Opp'n at 5–6 (citing Ex. 7, ECF No. 1711-7); it also points to the results of a 2015 chest

11   x-ray that came back negative, *id* at 5 (citing Ex. 4, ECF No. 1711-4).  However, as defendant

12   explains in his reply, asthma is a chronic disease that cannot be cured; defendant's symptoms

13   have varied over the years, which may have led him to believe he no longer had the condition.

14   *See* Reply at 2; *see also id.*, Ex. A, ECF No. 1712-1, at 1 (email from defendant to counsel

15   explaining he was not experiencing asthma symptoms for two years prior to his Chronic Care

16   Clinic Encounter in 2017).  Defendant's sworn declaration avers he has asthma, which is "a

17   severe condition which caused the BOP to transfer me from TAFT Federal Prison to my current

18   location, FPC [sic] Lompoc, as I was extremely sick due to the poor air quality."  Mot. to Compel

19   at 3; *see also United States v. Lee*, No. 19-CR-00419-SI-1, 2020 WL 2512415, at *2 (N.D. Cal.

20   May 15, 2020) (finding defendant met his burden of showing he had moderate to severe asthma

21   based on declarations from defendant and his wife).  The medical records defendant submits

22   corroborate this, *see* Reply at 2–4 (citing, *inter alia*, Ex. D (MTC Medical Record from April 16,

23   2015[3]).  His history of asthma was noted in April 2015 when he visited the nurse at FCI Taft for

24   vertigo, dizziness and light headedness; the nurse noted his history of asthma and previous use of

25   an inhaler, though noted he did not have symptoms at that time.  Reply, Ex. D at 1–2.  As part of

26

27           [3] Defendant submitted this record *in camera* and requested the court seal it due to the
     sensitivity of defendant's medical records.  Because the court GRANTS the request to seal as
28   discussed below, it considers the document here.

1    the same record, asthma is listed on defendant's "Patient Problem List." *Id.* at 6.  On June 18,

2    2015, defendant's physician diagnosed him with "asthma sever[e] frequent," noted "asthma" as a

3    chronic disease, stated he "was not using inhaler for 9 yrs now uses inhaler 5 times a day," and

4    prescribed a Q-Var inhaler for use twice a day.  Mot. to Compel at 10–11 (Medical Record dated

5    June 18, 2015).  In September 2015, after defendant had transferred to USP Lompoc, another

6    physician noted defendant's chronic asthma and prescribed an albuterol inhaler.  Reply at 3

7    (citing Opp'n, Ex. 4, ECF No. 1411-4, at 2).  Defendant also explains that the negative chest x-

8    ray cited by the government is consistent with a diagnosis of asthma.  *Id.* (citing WebMD, *How is*

9    *chest X-ray used to diagnose asthma?* (last updated on Feb. 29, 2018)[4] ("[A] person with asthma

10   will usually have a normal chest X-ray.")).  Based on this record, the court finds defendant has

11   shown he suffers from moderate to severe asthma.

12                          2.     Extraordinary and Compelling

13          As to the government's second argument, defendant contends his situation fits

14   under U.S.S.G. § 1B1.13 cmt n.1(A)(ii), which provides that a reduction in sentence is warranted

15   if defendant is "suffering from a serious physical or medical condition" that "substantially

16   diminishes the ability of the defendant to provide self-care within the environment of a

17   correctional facility and from which he or she is not expected to recover."  *Id.*  As defendant

18   points out, the CDC identifies "moderate to severe asthma" as a likely risk factor for severe

19   symptoms from COVID-19.  CDC, *People Who Are at Higher Risk for Severe Illness* (last

20   updated May 14, 2020)[5] (listing as those at particular risk: "People of all ages with underlying

21   medical conditions, particularly if not well controlled, including: . . . People with chronic lung

22   disease or moderate to severe asthma"); *see also United States v. Hernandez*, No. 1:10-CR-249

23   AWI, 2020 WL 2745697, at *3 (E.D. Cal. May 27, 2020) ("There is no dispute that the CDC

24   identifies [moderate to severe] asthma as a condition that increases the risk of serious

25   complications from Covid 19.").  Because there is currently no treatment for COVID-19, the

26   _____

27          [4] https://www.webmd.com/asthma/qa/how-is-chest-xray-used-to-diagnose-asthma.
            [5] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-

28   risk.html.

1   CDC recommends individuals with asthma protect themselves from the disease, by, *inter alia*:

2   "keep[ing] space between yourself and others," "stay[ing] home," and "[c]lean[ing] your hands

3   often by washing with soap and water or using an alcohol-based sanitizer."  CDC, How to Protect

4   Yourself & Others (last updated April 24, 2020).[6]  The recommendations emphasize that

5   "[k]eeping distance from others is especially important for people who are at higher risk of

6   getting very sick."  *Id.*

7          Despite what may be the BOP's best efforts to control the spread of COVID-19, as

8   detailed by the government in their opposition, *see* Opp'n at 7–8, the record before the court

9   demonstrates defendant cannot comply with the CDC's recommendations while incarcerated at

10  USP Lompoc.  The court draws this conclusion based on several pieces of evidence and

11  information defendant offers:  First, the risk of rapid spread of COVID-19 in USP Lompoc is

12  evidenced by the rapid outbreak of the virus at the neighboring institution, FCI Lompoc, where

13  887 inmates have tested positive for COVID-19, *see* Bureau of Prisons (BOP), *COVID-19 Cases*

14  (updated daily), https://www.bop.gov/coronavirus/ (reporting 886 inmates "recovered," 1 inmate

15  testing positive, 7 staff testing positive, and 2 inmates deceased); *United States v. Robinson*, No.

16  18-cr-00597-RS-1, 2020 WL 1982872, at *1 (N.D. Cal. Apr. 27, 2020) (recognizing "Lompoc

17  prison" as "battling one of the worst most serious COVID-19 outbreaks in the nation"); *United*

18  *States v. Connell*, No. 18-CR-00281-RS-1, 2020 WL 2315858, at *6 (N.D. Cal. May 8, 2020)

19  (noting same as to FCI Lompoc).  There is no evidence to suggest FCI Lompoc is materially

20  different from USP Lompoc in terms of layout and living conditions such that a similar outbreak

21  is unlikely at USP Lompoc.  Second, defendant submits a declaration by his counsel relaying

22  defendant's description of his living conditions at USP Lompoc as follows:

23          [H]e currently lives in the visitation center with 23 other prisoners.
            This facility has a bathroom with a toilet and sink, but no showers.
24          He told me that he has heard that next week he will be moved to one
            of the camp dorms where he will be living in a group of
25          approximately 150 other prisoners and several guards who rotate
            through different parts of the Lompoc complex.
26

27  ───────────────

28          [6] https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html.

Mot., Ex. D (Wiggin Decl.) ¶ 3, ECF No. 1710-4.  This declaration discloses two critical aspects

of defendant's incarceration: (1) defendant will be living with a large group of prisoners in dorm-

style living and (2) guards are not confined to USP Lompoc, but are rotating throughout the

Lompoc complex, creating a likelihood of cross-exposure between FCI Lompoc, where there is a

severe outbreak of COVID-19, and USP Lompoc.  This supports defendant's allegation that

physical distancing is unlikely in his living quarters at USP Lompoc and he is likely to be

exposed to COVID-19.  *See also United States v. Kamaka*, No. CR 18-00085 SOM, 2020 WL

2820139, at *4 (D. Haw. May 29, 2020) (relying, in part, on defendant's description that "prison

guards are rotating between FCI Lompoc and the camp at USP Lompoc").

In *Kamaka*, the district court analyzed the conditions at USP Lompoc and, in a

decision issued on May 29, 2020, made conclusions that also appear supported by the record here:

> What the record shows is that USP Lompoc has so far not
> demonstrated that it can protect its vulnerable inmates from COVID-
> 19, [defendant] is being held at USP Lompoc, which houses about
> 1707 individuals. That total includes 106 individuals in a satellite
> camp, and another 378 individuals in a different satellite camp that
> Kamaka is housed in. Nearby is the sister FCI Lompoc, where more
> than 900 inmates have tested positive for COVID-19. . . . More than
> 150 inmates at USP Lompoc have tested positive; according to the
> BOP, 53 of those inmates have not yet recovered. Id. Moreover, it
> appears that the BOP has not organized mass testing of the inmates
> at USP Lompoc, so the true case count may be much higher. . . .
>
> It is not clear how many of the 53 inmates at USP Lompoc who have
> not yet recovered are located in the satellite camps. . . . possibly all
> or most of the infected individuals could be at the camps. That might
> flow from the camps' communal dormitories that make social
> distancing impossible. Inmates reportedly live in large rooms with
> multiple beds less than 6 feet apart. They share a few toilets and
> showers. If an inmate is infected but has not been identified as such
> and isolated, other inmates almost certainly will come into contact
> with him. Indeed, according to [defendant], prison officials are not
> isolating individuals even after they show symptoms of having been
> infected with the coronavirus.
>
> . . . . While the COVID-19 numbers posted at the Bureau of Prisons
> website indicate that FCI Lompoc has managed to reduce the number
> of inmates with active infections, FCI Lompoc had such a large
> number of infections earlier that it is not hard to imagine transmission
> from one Lompoc facility to another. Finally, in a letter submitted by
> [defendant] along with his reply brief, he indicated that although the
> prison staff have been given N95 masks, no masks are available for
> the inmates, who must fashion their own from available items like T-
> shirts.

12

1    *Kamaka*, 2020 WL 2820139, at *3.

2          In its opposition, the government submits evidence of the procedures the BOP is

3  purportedly implementing generally systemwide, Opp'n at 9–10, and memoranda from the acting

4  Warden to staff and inmates at Lompoc that explain BOP's "efforts to encourage sanitation,

5  social distancing, and for inmates to wear masks have not proven effective." *See* Opp'n, Ex. 13,

6  ECF No. 1711-13, at 5.  The memoranda suggest the Warden is implementing "more aggressive

7  measures" for "at least 14 days" after April 20, 2020, but no evidence of record suggests these

8  measures are being complied with or proving effective. *Id.*  Furthermore, the government points

9  to a press release in which the BOP describes its efforts to improve the situation at the Lompoc

10  facilities, including attempts to achieve social distancing at FCI Lompoc only; at the same time

11  BOP concedes "[s]ocial distancing inside a prison is difficult to achieve, especially with an open

12  dormitory style setting."  Opp'n, Ex. 14, ECF No. 1711-14, at 2.

13          The court finds defendant's living conditions and the situation at USP Lompoc

14  more broadly are such that defendant is likely unable to protect himself from contracting COVID-

15  19 per the CDC guidelines. *Cf. Kamaka*, 2020 WL 2820139, at *4 (finding USP Lompoc unable

16  to protect inmates where, *inter alia*, the government did not provide information about protective

17  measures taken at USP Lompoc specifically).  In light of these conditions, defendant is at high

18  risk of contracting COVID-19 and defendant's asthma puts him at high risk of suffering serious,

19  possibly life-threatening, medical consequences if that happens.  Taken together, the court finds

20  this suffices to show an "extraordinary and compelling reason" to grant defendant compassionate

21  release. *See United States v. Fowler.*, No. 17-CR-00412-VC-1, 2020 WL 3034714, at *1 (N.D.

22  Cal. June 6, 2020) (finding defendant's chronic asthma presented an extraordinary and

23  compelling reason warranting compassionate release); *Lee*, 2020 WL 2512415, at *2 (same);

24  *United States v. Hernandez*, No. 18 CR. 834-04 (PAE), 2020 WL 1684062, at *3 (S.D.N.Y. Apr.

25  2, 2020) (same).

26      C.    <u>Sentencing Guidelines</u>

27          The Sentencing Guidelines instruct that "the court should consider the sentencing

28  factors set forth in 18 U.S.C. § 3553(a) when deciding a motion for compassionate release, and

1   that the Court should not grant a sentence reduction if the defendant poses a risk of danger to the

2   community, as defined in the Bail Reform Act." *Esparza*, 2020 WL 1536155, at *3 (citing

3   U.S.S.G. § 1B1.13); *see also* 18 U.S.C. § 3582(c)(1)(A).

4            Defendant's crime is a serious one, but it is nonviolent.  Defendant has served over

5   half of his 120-month sentence, and, if good time credits are applied, he is projected to be

6   released in roughly three years, assuming BOP does not transfer him imminently to serve the

7   balance of his period of incarceration on home confinement, as BOP has signaled it is preparing

8   to do.  Mot. at 9 (citing Ex. A (Public Information Inmate Data as of May 8, 2020), ECF No.

9   1710-1).  The government does not dispute that defendant has an exemplary record while in

10  prison, with no disciplinary incidents, Mot., Ex. B, ECF No. 1710-2, or that, during the six years

11  defendant spent on pretrial release before self-surrendering to serve his sentence, he had no

12  infractions or incidents, Mot. at 9.  Importantly, defendant has shown significant evidence of

13  rehabilitation, including teaching GED and remedial reading classes to other inmates and

14  volunteering for a program called "Those Outspoken" at Taft where prisoners speak to at-risk

15  youth in the community.  Mot. at 24 (citing Wiggin Decl. ¶¶ 2,4).  He has been successful

16  working for Unicor, BOP's industrial program, and has been entrusted to travel up to 20 miles

17  from the prison as part of his job with Unicor.  *Id.* (citing Wiggin Decl. ¶¶ 2,4); *see United States

18  v. Parker*, No. 2:98-CR-00749-CAS-1, 2020 WL 2572525, at *11 (C.D. Cal. May 21, 2020)

19  (finding evidence of defendant's rehabilitation weighed in favor of granting motion for

20  compassionate release and collecting cases).

21           The court has reviewed all the factors to be considered in imposing a sentence, 18

22  U.S.C. § 3553(a), and finds no factor or combination of factors precludes the requested remedy

23  here, particularly given defendant's solid evidence of impressive rehabilitation, *see Pepper v.

24  United States*, 562 U.S. 476, 491 (2011) ("[E]vidence of postsentencing rehabilitation may be

25  highly relevant to several of the § 3553(a) factors that Congress has expressly instructed district

26  courts to consider at sentencing.").  In light of the foregoing, the court also finds defendant does

27  not present a risk of danger to the community as articulated in 18 U.S.C. § 3142(g).

28

14

1      Accordingly, the court exercises its discretion to reduce defendant's sentence as

2  described below, because extraordinary and compelling reasons warrant such a reduction.

3  IV.    CONCLUSION

4      For the foregoing reasons, defendant's motion for compassionate release is

5  GRANTED as follows:

6      The court modifies defendant's sentence of incarceration to time served. The

7  remaining portion of his original term of imprisonment shall be served as supervised release with

8  the special condition that defendant be subject to home confinement, to be followed by the 36-

9  month term of supervised release imposed in the original sentence.  *See Lee*, 2020 WL 2512415,

10  at *2 (ordering same).

11      In addition to other court-imposed conditions of release, defendant's movement in

12  the community shall be restricted as follows, with all activities subject to pre-approval by the

13  probation officer: defendant shall be restricted to his residence at all times except for

14  employment, education, religious services, medical, substance abuse or mental health treatment,

15  attorney visits, court appearances, court-ordered obligations, or other activities as pre-approved

16  by the probation officer.  *Id.*

17      Defendant's request to seal Exhibit D to his reply is GRANTED, as the document

18  contains sensitive medical records in which defendant has a compelling privacy interest.  *See* Not.

19  of Req. to Seal, ECF No. 1713; *see also Johnsen v. Tambe*, No. 19-141-TSZ-MLP, 2019 WL

20  4014256, at *2 (W.D. Wash. Aug. 26, 2019) (finding plaintiff's "privacy interest in his own

21  medical  records to be a sufficiently compelling reason to seal the medical records themselves").

22  The Clerk is hereby directed to file Exhibit D to defendant's reply on the docket, under seal.

23      Defendant's motion to compel is hereby DENIED as moot.

24      This order resolves ECF No. 1696, 1710, 1713.

25      IT IS SO ORDERED.

26  DATED:  June 14, 2020.

27                                            CHIEF UNITED STATES DISTRICT JUDGE

28